**LANDMARK LEGAL FOUNDATION,**
**Plaintiff,**

v.

**INTERNAL REVENUE SERVICE,**
**Defendant.**

**No. CIV. A. 97–01474(HHK).**

United States District Court,
District of Columbia.

March 9, 2000.

Richard P. Hutchison, Kansas City, MI, Mark R. Levin, Herndon, VA, Joseph Cammarata, Chaikin & Sherman, P.C., Washington, DC, for Plaintiff.

David A. Hubbert, J. Brian Ferrel, Joseph A. Sergi, United States Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

KENNEDY, District Judge.

Before the court is plaintiff Landmark Legal Foundation's (hereinafter Landmark) Motion to Compel Release of Information and defendant Internal Revenue Service's (hereinafter IRS) Motion for Summary Judgment. Landmark seeks to compel the IRS to produce certain documents requested under the Freedom of Information Act (hereinafter FOIA).[1] The IRS has stated as its basis for withholding the documents FOIA Exemptions 3 and 6.[2] Having considered the motions, the responses thereto, and the entire case record, the court shall: (1) grant in part and deny in part the IRS's motion for summary judgment, and (2) deny Landmark's motion to compel production of documents.

## II. FACTUAL BACKGROUND

On January 28, 1997, Landmark filed a FOIA request with the IRS seeking agency records described as follows:

[C]opies of any and all documentation (including, but not limited to, paper correspondence, telephonic inquiries and/or electronic communications) evincing requests since January 1, 1992[,] by individuals and/or entities external to the [IRS] for audits or investigations of 501(c)(3) tax-exempt organizations. Please include the names of the individuals and/or entities requesting the audits or investigations and the names of the 501(c)(3) tax-exempt organizations for which audits or investigations were requested. We wish to make clear that we are not asking the IRS to provide information revealing whether, in fact, any of these entities are actually being audited.

Moreover, please provide us with copies of any and all documentation (including, but not limited to, paper correspondence, telephonic inquiries and/or

---

1. 5 U.S.C. § 552 (West 1996 & Supp.1999).

2. 5 U.S.C. § 552(b)(3) & (b)(6) (West 1996).

electronic communications) evincing inquiries since January 1, 1992[,] by individuals and/or entities external to the [IRS] about the tax status of any 501(c)(3) tax-exempt organizations. Please include the names of the individuals and/or entities who made the inquiries and the names of the 501(c)(3) tax-exempt organizations they inquired about.

Landmark also requested that the IRS waive the standard search, review, and duplication fees. On September 22, 1998, this court granted Landmark's fee-waiver request pursuant to 5 U.S.C. § 552(a)(4)(A), finding that "the records requested by Landmark will likely reveal information about the operations or activities of the IRS" and that "Landmark's various methods of dissemination are adequate to convey the information it seeks to the general public." [3]

The IRS subsequently released to Landmark a set of full and partial documents responsive to Landmark's request, together with a 9253–page *Vaughn* index.[4] On July 26, 1999, the IRS moved for summary judgment, attaching the affidavits of Elissa Sissman, Harold N. Toppall and Thomas Miller. The IRS asserts that any redaction or withholding of information from the release was authorized by FOIA exemptions 3 and 6.

### III. ANALYSIS

Summary judgment should be granted to the government in a FOIA case on the basis of agency affidavits "when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [ ]or by evidence of agency bad faith.' " [5] The government carries the burden of demonstrating that the documents requested are exempt from disclosure under the FOIA.[6]

### A. Exemption 3

The IRS seeks to withhold twenty categories of documents under Exemption 3. As described by the IRS [7], these categories are:

1. Correspondence (including enclosures) sent directly to the Service, or forwarded to the Service by third parties, complaining about activities undertaken by a tax exempt organization and requesting some action by the Service, or requesting that an organization not be granted tax exempt status.

2. Correspondence from a member of Congress or the White House that served only as a cover letter for 1 above.

3. Letters from member[s] of Congress either written on their own behalf or that reflecting [sic] complaints received by telephone without any written correspondence.

4. Internal memoranda, including drafts, from the Exempt Organizations office referring a complaint for action.

5. Responses, including drafts, from the Service responding to complaints that an organization is not comply-

3. *See* Mem. Op. of Sept. 22, 1998, at 8–9.

4. IRS's Mot. Summ. J. at 2–7 & n. 2. On July 19, 1999, the IRS attempted to file the *Vaughn* index in this court, but the clerk's office did not accept the filing. Landmark concedes that it received its copy of the same *Vaughn* index on June 19, 1999. The IRS refiled its *Vaughn* index—per the court's September 10, 1999 order—on September 17, 1999.

5. *Miller v. Casey*, 730 F.2d 773, 776 (D.C.Cir. 1984) (citing *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981)).

6. *See Computer Prof'ls for Social Responsibility v. United States Secret Serv.*, 72 F.3d 897, 902 (D.C.Cir.1996) (citation omitted).

7. *See* Def.'s Mot. Summ. J. at 7–11 (citing Sissman Decl. ¶ 5).

ing with the laws governing tax exempt organizations.

6. Letters from members of the public or from members of Congress on their own behalf or on behalf of their constituents, regarding specific audits of tax exempt organizations and the Service's responses.

7. Correspondence (including enclosures in some instances) sent directly to the Service by third parties (e.g. by Members of Congress) regarding the activities of an organization believed by the constituents to be tax exempt but determined by the Service not to have been granted tax exempt status and the Service's responses.

8. Correspondence from a Member of Congress, or other third party, that served only as a cover letter for 6 and 7 above.

9. Letters (including attachments) sent to the Service, either directly by members of the public or forwarded to the Service by members of Congress, and cover letters from a member of Congress to forward to the Service the constituent's letter, requesting confirmation of the tax exempt status of an organization and the Service's responses.

10. Letters, (including attachments), sent to the Service, either directly by members of the public or forwarded to the Service by Members of Congress, and cover letters from a Member of Congress to forward to the Service the constituent's letter, regarding potential activity of a tax exempt organization or the requirement of an organization to file a tax exempt application and the Service's responses.

11. Letters from members of the public inquiring as to how to apply for tax exempt status and the Service's responses.

12. Letters (including attachments) from an applicant, or other interested third party, sent directly to the Service or forwarded by a Member of Congress, or written by a Congressman's [sic] on behalf of a constituent requesting assistance regarding an application for exempt status pending with the Service and the Service's responses.

13. Correspondence from a member of Congress, or other third party, that served only as a cover letter to 12 above and the Service's responses.

14. Letters from members of the public, or members of Congress on behalf of their constituents, to the Service, regarding legislative proposals or about [sic] the laws governing tax exempt organizations and the Service's responses.

15. Letter[s] from the Service responding to a member of the public's complaint that an organization which was recognized by the Service as exempt from federal taxation was not complying with the laws regarding state tax exemption.

16. Internal memoranda regarding issues related to tax exempt organizations to the appropriate Key District Office or other Service official.

17. Letter[s] from the Service to another federal agency requesting information about particular tax exempt organizations for purposes of evaluating possible tax implications with respect to those organizations.

18. Handwritten or typewritten notes to the file or notes to other Exempt Organizations personnel pertaining to administrative matters regarding a complaint or inquiry about a tax exempt organization.

19. Handwritten or typewritten notes to the file or notes to other Exempt organizations personnel pertaining to substantive matters regarding a

complaint or inquiry, including evaluation material.

20. Administrative processing documents pertaining to the correspondence described above.

Exemption 3 allows for the withholding of information specifically exempted from disclosure by statute, provided that the statute (a) requires matters to be withheld from the public in such a manner as to leave no discretion on the issue, or (b) establishes particular criteria for withholding or refers to particular types of matters to be withheld.[8] As the statutory basis for this exemption, the IRS cites 26 U.S.C. § 6103, which provides that "[r]eturns and return information shall be confidential." It is well-settled that Section 6103 of the Internal Revenue Code is an exempting statute under Exemption 3.[9]

"Return information" in § 6103 is defined broadly to include "any information gathered by the IRS with regard to a taxpayer's liability under the Internal Revenue Code."[10] As *Dowd* and *Lehrfeld* illustrate, the scope of "return information" is broad enough to include third-party informants and inquiries into the tax-exempt status of organizations.

In *Dowd*, the plaintiffs—two Department of Justice attorneys—filed suit for libel against the *Wall Street Journal* and one of its reporters. The defendants had published an article which claimed plaintiffs improperly pressured an underworld figure (who was also named as a defendant in the suit) to become a government witness. The defendants requested production of "all communications with [the IRS]" by plaintiffs that "refer[red] in any way" to the underworld figure, his colleagues, or his business.[11] The defendant claimed those documents might show that one of the plaintiffs "tried to pressure" the underworld figure by referring information about his tax liability to the IRS, and might explain why the IRS subsequently conducted an audit of one of his colleagues.[12] Noting the "great[ ] public interest in confidentiality" of sensitive tax information, the court granted the IRS's motion for a protective order under § 6103.[13]

The IRS's determination of taxpayers' liabilities includes its determinations regarding the tax-exempt status of organizations. In *Lehrfeld*, the district court concluded that the IRS properly withheld documents in support of the application for tax-exempt status of a political organization.[14] Reasoning that "[a]n official inquiry into the qualification of an organization for tax-exempt status, even the initial inquiry, is an IRS investigation related to that organization's tax liability," the court held that the application documents were confidential "return information" within the meaning of § 6103.[15] The D.C. Circuit affirmed, finding the IRS's interpretation of § 6103 reasonable:

> [T]o determine whether an applicant meets the statutory criteria [for tax-exempt status] is, as a practical matter, to determine whether the applicant has any income tax liability. It follows that an application for tax-exempt status and any documents related to it are received

---

8. 5 U.S.C.A. § 552(b)(3) (West 1996).

9. *See, e.g., Church of Scientology v. IRS*, 792 F.2d 146, 149–50 (D.C.Cir.1986), *aff'd*, 484 U.S. 9, 11, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987).

10. *Dowd v. Calabrese*, 101 F.R.D. 427, 438 (D.D.C.1984) (citing *Chamberlain v. Kurtz*, 589 F.2d 827 (5th Cir.1979)); *see also Lehrfeld v. Richardson*, 954 F.Supp. 9, 13 (D.D.C. 1996), *aff'd*, 132 F.3d 1463 (D.C.Cir.1998) (" 'Return information' is defined broadly by

the statute to include almost any information compiled by the IRS in connection with its determination of a taxpayer's liability.").

11. 101 F.R.D. at 437.

12. *Id.*

13. *Id.* at 438.

14. 954 F.Supp. at 13.

15. *Id.*

"with respect to the determination of the existence, or possible existence, of liability," and as such ... the IRS may not disclose them.[16]

██] The court concludes from *Dowd* and *Lehrfeld* that all information communicated to, from, and within the IRS regarding the actual or potential tax liabilities, audits, or tax-exempt status of a particular organization falls under the broad definition of "return information" in § 6103.

Despite the broad coverage of the exempting statute, Landmark contends that the IRS's descriptions of the twenty categories of withheld and redacted documents are "impermissibly 'conclusory, merely reciting statutory standards ... [and] are too vague or sweeping'" to support a grant of summary judgment.[17] Landmark relies upon *King v. Department of Justice,* in which the D.C. Circuit reviewed whether affidavits submitted by the FBI provided the court with an adequate basis to approve the withholding of documents as classified information under FOIA Exemption 1.[18] The court noted that "a system for categorizing Exemption 1 claims may be appropriate, particularly where the documents in question are voluminous and the same exemption applies to a large number of segments."[19] The FBI's affidavits, however, supplied only "far-ranging category definitions":

> For example, information concerning intelligence activities, sources, and methods ... is defined to encompass:

Information that could reveal or identify a present, past or prospective intelligence source, whether a person, organization, group, technical system, mechanism or device that provides, has provided or is being developed to provide foreign intelligence or foreign counterintelligence. Information which could reveal or identify a present, past or prospective intelligence method, procedure, mode, technique or requirement used or being developed to acquire, transmit, analyze, correlate, evaluate or process foreign intelligence or foreign counter-intelligence or to support an intelligence source, operation or activity....[20]

By describing the withheld documents implicitly, solely in terms of the potential effects of their disclosure, the FBI's affidavits could not help the court determine whether the material withheld was logically within the domain of Exemption 1.

Unlike the *King* affidavits, each of the IRS's category descriptions purports to refer explicitly and accurately to each of the documents contained therein, and Landmark has identified no evidence to the contrary, either in the record of this case or in the *Vaughn* index it has received from the IRS.[21] While the affidavit covers a large number of documents, it also provides a large number of category descriptions, none of which can be said to be far-ranging, vague, or sweeping. Moreover, the descriptions of categories 1–13, 15, and 17 provide reasonably specific detail and

16. 132 F.3d at 1467.

17. Pl.'s Opp. Summ. J. at 16–17 (quoting *King v. Department of Justice,* 830 F.2d 210, 219 (D.C.Cir.1987)).

18. 830 F.2d at 219.

19. *Id.* at 224.

20. *Id.* at 221 n. 92.

21. Landmark refers the court to pages 6–19 of its Motion to Compel Release of Information to support its contention that "the IRS's *Vaughn* index submission was likewise wholly inadequate to provide legal justification for the exemptions asserted in support of its withholdings and redactions." Pl.'s Opp. Summ. J. at 11. The cited pleadings, however, nowhere identify contradictions between the affidavits and the *Vaughn* index, or specific inadequacies in the *Vaughn* index, at least with respect to the documents withheld under Exemption 3. *See* Pl.'s Mot. to Compel Release of Information at 6–15 (contesting the IRS's interpretation of "return information" in § 6103); *id.* at 15–16 (noting that the Sissman affidavit does not describe and discuss each document individually, with no comment as to the adequacy of the *Vaughn* index); id. at 16–19 (discussing Exemption 6).

demonstrate that the information withheld or redacted from the documents in those categories logically falls within the claimed exemption. Accordingly, the court shall grant the IRS's motion for summary judgment with respect to these categories of documents and the administrative processing documents pertaining thereto.

■ The descriptions supplied in the IRS's affidavit for categories 14, 16, 18, and 19, however, are facially insufficient for the court to determine that the withheld and redacted information constitutes information communicated to, from, and within the IRS regarding the actual or potential tax liabilities, audits, or tax-exempt status of a particular organization. As the IRS has "fail[ed] to provide a sufficiently detailed explanation to enable [the court] to make a de novo determination of the [IRS's] claims of exemption" for these categories, the court "has several options, including inspecting the documents in camera, requesting further affidavits, or allowing the plaintiff discovery."[22] As the IRS has withheld over 800 pages of documents under these four categories, *in camera* review is infeasible here. The court shall deny IRS's motion for summary judgment with respect to categories 14, 16, 18, and 19 and permit the IRS to submit further affidavit(s) that more clearly define these categories. The IRS may then refile for summary judgment if it chooses to do so.

## B. Exemption 6

The IRS has also cited Exemption 6 to support its withholding the identity of, and information which may indirectly identify, a member of the public associated with the twenty categories of documents withheld and redacted under Exemption 3.[23] Ex-

emption 6 permits an agency to withhold information in "personnel and medical files and similar files disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[24]

The IRS relies on the declaration of Elissa Sissman to identify the personal-privacy interests at issue.[25] Specifically, the IRS has determined "that letter writers have some expectation of privacy when expressing their personal opinions; that private citizens have expectations that when they provide information voluntarily to the government they will not be damaged in their persons or reputations by disclosure of their identities; and that they be protected from possible harassment or reprisal resulting from the expression of their views."[26]

Contrary to the IRS's contention, Exemption 6 does not provide blanket anonymity for private citizens who write letters requesting assistance from government officials, even when personal relationships are implicated. For example, in *Holland v. Central Intelligence Agency*, this court reviewed the CIA's withholding under Exemption 6 of the name of the author of a letter requesting assistance from John J. McCloy, then the Deputy Director of the CIA.[27] The court agreed with the CIA that the letter "indicates a relationship between McCloy and the [author], either personal or professional sufficient to prompt Mr. McCloy's intercession, which itself was sufficient to merit an inquiry and response from the head of the CIA."[28] Nevertheless, the court concluded that it could "conjure no rationale ... to justify assessing this as anything more than a

---

22. *See Spirko v. United States Postal Serv.*, 147 F.3d 992, 997 (D.C.Cir.1998).

23. Def.'s Mot. Summ. J. at 27.

24. 5 U.S.C. § 552(b)(6) (West 1996).

25. Def.'s Mot. Summ. J. at 29 (citing Sissman Decl. ¶ 6).

26. Sissman Decl. ¶ 6.

27. 1992 WL 233820, *15 (D.D.C. Aug.31, 1992)

28. *Id.* at *16.

de minimis privacy interest."[29] Without a more particularized assertion of the affected individuals' expectations of privacy with respect to the letters written and information provided to the government here, the court does not find more than a *de minimis* privacy interest here either.

█] The ultimate inquiry, then, is "the extent of the interference with privacy that would be caused by disclosure" of the identifying information.[30] Here, the IRS's professed concern is that disclosure would potentially cause harassment or reprisal. However, the IRS has suggested no reason why existing laws are insufficient to deter any criminal or tortious conduct targeted at persons who would be identified.

This circuit rejected a similar argument in *Board of Trade of the City of Chicago v. Commodity Futures Trading Commission*.[31] In that case, the defendant commission sought to withhold under Exemption 6 the names of persons who had criticized the functioning of the plaintiff board.[32] The commission asserted a privacy interest in "avoidance of possible harassment of [the board's critics] by the Board or others with whom they work and associate."[33] In support of its apprehension, the commission noted that the board's president had testified that he wanted to find out why the persons involved had chosen to voice their grievances to the commission rather than the board.[34] The court found this testimony insufficient to support the finding of a privacy interest:

> Whether or not it is within the realm of the Commission's expertise to equate the [board] president's desire for talks with a strong potential for harassment, we find it difficult to believe that the Commission could not utilize its broad regulatory powers to prevent any improper conduct on the part of Board representatives. At any rate, we are not persuaded by the Commission's claim that divulgence of withheld materials serving to identify the [board's critics] "would constitute a clearly unwarranted invasion of personal privacy."[35]

There is even less to justify finding a privacy interest here, because the IRS has offered no factual basis for its apprehensions of possible harassment or reprisal. Though the IRS's concern is understandable, it is not sufficiently supported on the record. Accordingly, the court shall deny the IRS's motion for summary judgment with respect to the information withheld under Exemption 6.

## C. The Scope of the IRS' Search

While "there is no requirement that an agency produce all responsive documents,"[36] the agency's responses must not "raise serious doubts as to the completeness of the search."[37] Landmark posits three reasons why the affidavit of Harold N. Toppall raises doubts as to the completeness of the IRS's search. First, Landmark notes that Toppall failed to provide a full listing of work codes used in the computer system to demonstrate to the court that the IRS had conducted its search under all codes falling within the scope of Landmark's request.[38] Second, Landmark contends that Toppall's method of sending a memorandum to "all manag-

---

29. *Id.*

30. *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C.Cir.1989).

31. 627 F.2d 392 (D.C.Cir.1980).

32. *Id.* at 400.

33. *Id.*

34. *Id.*

35. *Id.* (citation omitted).

36. *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 892 n. 7 (D.C.Cir.1995) (citing *Perry v. Block*, 684 F.2d 121, 128 (D.C.Cir. 1982)).

37. *Perry*, 684 F.2d at 127.

38. Pl.'s Opp. Mot. Summ. J. at 12.

ers in the EO Division requesting that they conduct a search for documents responsive to plaintiff's FOIA request" was inadequate.[39] Finally, Landmark notes that the Toppall declaration states that 114 case files, comprising approximately 8 percent of the potentially responsive files, were determined to be missing.[40]

Landmark's first point is well-taken; Toppall's affidavit does not list all the computer codes considered and fails to give a sufficiently detailed explanation why only certain codes were employed in the search. Landmark's second point is supported only by naked skepticism and provides the court with no reason to doubt the adequacy of Toppall's memorandum to the EO Division managers. Landmark's final point is rebuffed by Toppall's reasonably detailed description of the search for the missing files:

> These are files missing from Projects Branch 1 during the time period 1992–1994. A search was conducted of the imaging disks on which closed files in the EO Division are generally stored; none of these cases were on the imaging disks. In addition, the hard copy reading files of Projects Branch 1 for 1992–1994 (consisting of three binders, each with an estimated 200 pages) was searched. The Service's response letters for 11 of these cases were located, but no complete case files for these 114 cases were found.[41]

The court shall not grant Landmark's motion to compel the computer codes because, in a separate order filed this day, the court shall permit Landmark to take Toppall's deposition. Landmark will assuredly bring to the court's attention any shortcomings in the scope and nature of the IRS's search that it gleans from Toppall's deposition. The court shall deny the remainder of Landmark's motion to compel.

**39.** *Id.* at 12.

**40.** *Id.* at 13.

**41.** Toppall Decl. ¶ 4.

## V. CONCLUSION

For the foregoing reasons, the court grants the IRS's motion for summary judgment concerning document categories 1–13, 15, 17, and 20, and denies without prejudice the motion concerning categories 14, 16, 18, and 19. The court also denies Landmark's motion to compel production of documents.

Accordingly, it is, this 9th day of March 2000, hereby

**ORDERED** that the IRS's motion for summary judgment (Doc. # 64) concerning document categories 1–13, 15, 17, and 20 is **GRANTED**; and it is further

**ORDERED** that the IRS's motion for summary judgment (Doc. # 64) concerning document categories 14, 16, 18, and 19 is **DENIED** without prejudice; and it is further

**ORDERED** that Landmark's motion to compel production of documents (Doc. # 68) is **DENIED**.

## ORDER

Before the court are: (1) defendant IRS's motion for protective order preventing plaintiff from taking the deposition of Harold Toppall, Thomas Miller, and Donald Squires; (2) defendant IRS's motion for protective order preventing plaintiff from taking a 30(b)(6) deposition; and (3) plaintiff Landmark's motion to compel production of documents and for costs. Having considered the motions, the responses thereto, and the entire case record—and noting that "[o]nce the motion for summary judgment is filed, accompanied by the Vaughn index ... discovery in a FOIA case is restricted and should be permitted only if limited to, for example, the scope of the agency's search for documents,"[1]—the

**1.** *Bureau of Nat'l Affairs, Inc. v. IRS,* 24 F.Supp.2d 90, 91 (D.D.C.1998).

court concludes: (1) IRS's motion for protective order preventing Landmark from taking the deposition of Harold Toppall should be denied; (2) IRS's motions for protective orders preventing Landmark from taking a 30(b)(6) deposition and the depositions of Thomas Miller and Donald Squires should be granted; and (3) Landmark's motion to compel production of documents and for costs should be denied.

Accordingly, it is, this 9th day of March 2000, hereby

**ORDERED** that the IRS's motion for protective order to prevent Landmark from taking the deposition of Harold Toppall (Doc. # 82) is **DENIED**; it is further

**ORDERED** that the deposition of Harold Toppall shall be completed within 4 hours; it is further

**ORDERED** that the IRS's motions for protective orders to prevent Landmark from taking the deposition of its 30(b)(6) deponent(s) (Doc. # 83) and the depositions of Thomas Miller and Donald Squires (Doc. # 82) are **GRANTED**; and it is further

**ORDERED** that Landmark's motion to compel production of documents and for costs (Doc. # 85) is **DENIED**.